# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

**UNITED STATES OF AMERICA,**

*Plaintiff,*

v.

**[2] JONATHAN TORRES-ROJAS,**

*Defendant.*

**CRIMINAL NO. 18-211 (DRD)**

## *OMNIBUS* OPINION AND ORDER

Pending before the Court is Defendant, Jonathan Torres-Rojas' *Motion to Suppress Statements the Product of Repeated, Unrelenting Interrogatories, on Numerous Days, which had the Cumulative Impact of Coercion* (Docket No. 79). A *Response in Opposition* was filed by the United States. *See* Docket No. 87[1].

The Defendant is essentially claiming that his "December 22nd statements were not the product of voluntary choice, but rather a result of unconstitutional police conduct, and therefore must be suppressed," as "[t]he totality of the circumstances support the sufficiency of the *prima facie* showing that [his] statements on December 22nd, 2016, were not voluntary, and therefore in violation of his Fifth Amendment rights." Docket No. 79 at pp. 3, 10. In *Opposition*, the Government asks the Court to deny Torres-Rojas' suppression "because the defendant's statements, as contained in Defendant's sworn statement, are simply not accurate and therefore, they do not amount to an unknowing and involuntary confession under the law." Docket No. 87 at p. 4.

---

[1] After the *Suppression Hearing* concluded, the United States and the Defendant filed supplemental briefs per Court order on June 13, 2022. *See* Docket Nos. 148 and 149, respectively.

Sometime thereafter, Torres-Rojas filed a *Supplemental Suppression Motion* pursuant to Franks v. Delaware, 438 U.S. 154, 171 (1978). *See* Docket No. 150. A *Response in Opposition* was filed by the United States. *See* Docket No. 158. This time, Torres-Rojas claims that "Agent Arnold Garcia provided false information in the affidavit for a search warrant for the DNA of Mr. Torres . . . knowingly or with reckless disregard for the truth, and without its inclusion, the Aibonito Court that granted the warrant would have instead made a negative finding as to probable cause." Docket No. 150 at p. 1. In turn, the United States argues that the Court should deny the motion as the search is presumed to be valid per First Circuit precedent. As such,

> Defendant has failed to rebut the presumption: He has failed to make the requisite 'substantial preliminary showing' that the Puerto Rico Police Department ("PRPD") agent who prepared the affidavit in support of the state search warrant made any false statement (let alone intentionally or recklessly, as required by established jurisprudence) that was material to the probable cause finding that resulted in the issuance of the warrant.

Docket No. 158 at pp. 1-2.

For the reasons stated herein, the Court hereby **DENIES** the Defendant's *Motion to Suppress* (Docket No. 79) and *Franks Motion* (Docket No. 150).

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This case stems from a carjacking offense resulting in the death of the owner of El Rejon del Gallo, a small *chinchorro*[2] located in the Municipality of Orocovis, Puerto Rico. Specifically, on June 12, 2015, as the owner of the bar was closing his business for the night, assailants robbed him from cash and a vehicle, a 2001 Gray Toyota Sequoia, V8 4WD, PR License Plate: EDL-582, VIN No. 5TDBT44A71S22909. *See Indictment*, Docket No. 3 at p.

---

[2] "A word used in Puerto Rico for a small, unassuming bar." Docket No. 149 at p. 2, n.1.

2. The owner was ultimately shot by one of the assailants and died at the scene. *See id.* The assailants fled the scene thereafter. *See id.*

An investigation by the Puerto Rico Police Department (hereinafter, "PRPD") began within days of the events. *See Transcript of Suppression Hearing, Day 2*, Docket No. 142 at p. 44. The FBI joined the investigation early on. *See id.* at p. 45. As the investigation proceeded, Torres-Rojas became a suspect. *See id.* at p. 42. By July 2016, Torres-Rojas had become a prime suspect as codefendant, Juan Negron "Raton" signaled him out as a suspect, namely, the shooter. *See id.* at pp. 9, 22. Raton was a suspect from the beginning of the investigation. *See Transcript of Suppression Hearing, Day 1*, Docket No. 140 at p. 32. At some point after the events that led to this case, Raton was arrested for an unrelated state charge. While he was imprisoned, the FBI paid him a visit and questioned him related to this case. It was then that Raton signaled Torres-Rojas as a participant of the robbery. *See id.* at p. 33. As the PRPD had Torres-Rojas' mugshot on file, the officers showed the photo to Raton, and he identified the Defendant. *See id.* at p. 34.

As a result thereof, FBI Task Force Officers (hereinafter, "TFO") Cristobal Rodriguez and Carlos Cabán began searching for Torres-Rojas within his community. *See id.* Upon identifying his residence through residents of the neighborhood, the TFOs left him a note in his door asking that he contact them. *See id.* Torres-Rojas contacted the agents, and the TFOs informed him that they needed to speak to him. As such, Torres-Rojas appeared at the Orocovis station on August 8, 2016. *See id.* at p. 35. By that time, Torres-Rojas was already a suspect of the crime. *See id.* at p. 36.

On August 8, 2016, Torres-Rojas appeared at the Orocovis station with his father. *See id.* While his father waited outside, Torres-Rojas was taken to an interrogation room for the

interview. *See id.* at p. 35. The interview was recorded and lasted approximately 20 minutes. *See id.* at p. 50.  The Defendant was given his *Miranda* rights, which were read to him by the TFOs as he claimed that he did not know how to read. *See id.* at p. 37; *see also* Gov. Exhibit No. 1. Essentially, the TFOs made some background questions and inquired him as to his participation in the murder of the businessman in Orocovis. *See Transcript of Suppression Hearing, Day 1*, Docket No. 140 at p. 11. He denied that he had any participation in the murder. *See id.* When the Defendant was asked whether he was willing to undergo a polygraph test, he said he had to check with an attorney. *See id.* at p. 53. When he was asked whether he was willing to undergo a DNA test, he said he had to consult with an attorney. The agents then told him that was his right. *See id.* at p. 54. The interview lasted around half an hour and Torres-Rojas was free to go but agreed to speak with the agents again if need be. *See id.* at pp. 11, 13. The Defendant appeared normal, calmed and he was not under arrest or handcuffed during this interview. *See id.* at pp. 12-13.

Within a few days, PRPD Agent Nelson Forti arrived at the precinct and overheard a conversation between PRPD Agent Arnold García and TFO Cabán about a murder and carjacking that took place in Orocovis. *See id.* at p. 61. The conversation caught Forti's attention as it was related to the murder of a businessman in his business. *See id.* Upon inquiring as to whether they have any suspects related to these events, TFO Cabán stated the name of Jonathan Torres-Rojas. *See id.* He was surprised as Torres-Rojas had cooperated and testified in a previous case handled by Agent Forti. *See id.* at p. 62. The Defendant even provided a sworn statement that led to the resolution of that case. *See id.* As García and Cabán told him that they were interested in interviewing him, Forti drove to the Defendant's residence in an official Puerto Rico Police vehicle. *See id.* Upon arriving he spoke with Torres-Rojas'

4

father, and since the Defendant was not at the residence Forti gave his number to Torres-Rojas'
father and asked him to inquire if the Defendant could give him a call. *See id.* at p. 63. After
finishing his shift, Forti received a call from an unknown number, and it was Torres-Rojas.
*See id.* Forti narrated to the Defendant that fellow officers attached to the FBI task force were
interested in interviewing him pertaining to a case named El Rejon del Gallo. *See id.* at p. 64.
Forti also told Torres-Rojas that the agents would read him his rights and that if he wanted to
talk, to tell the truth. *See id.* The Defendant replied by telling Forti "that he was there but the
one that shot was 'Raton,' who went up an embankment." *Id.* Forti finished by telling the
Defendant that he would provide the agents with the number he made the call from so that they
call Torres-Rojas in order to set up an interview. *See id.* Forti testified that during the call,
Torres-Rojas seemed calm, normal. *See id.* at pp. 64-65. Forti informed the agents that he had
spoken to the Defendant and gave them his phone number. *See id.* at p. 65. But he only told
Agent Cabán what he told him over the phone regarding the murder of the businessman. *See
id.* at p. 75.

On August 18, 2016, Torres-Rojas arrived at the Orocovis station with his father and
met with TFOs Cabán and Rodriguez. *See id.* at p. 14. The interview was recorded. *See id.* at
p. 50. This time, the TFOs read the *Miranda* rights to the Defendant; thereafter Torres-Rojas
apologized for a misunderstanding with Agent Forti as to his willingness to be interviewed
further. *See* Gov. Exhibits No. 2 and 2a; *see also Transcript of Suppression Hearing, Day 2*,
Docket No. 142 at p. 102. Torres-Rojas denied once again his involvement with the murder or
carjacking and that he would speak to an attorney later. *See Transcript of Suppression Hearing,
Day 1,* Docket No. 140 at p. 17. He further told the agents that he did not want to talk about
this matter anymore, and the next time he spoke with the agents would be with an attorney

present. *See id.* at p. 44. The agents forewarned the Defendant that there were going to be federal charges for the incident and that there were other people signaling him out as the participant. *See id.* Lastly, the agents told Torres-Rojas next time he saw them it will be bad news, to which Torres-Rojas riposted that next time he saw them would be with an attorney. *See id.* Yet, Torres-Rojas seemed calmed during the interview. *See id.* at p. 17. The interview concluded within ten (10) minutes and the Defendant left with his father. *See id.* at p. 44. Torres-Rojas was never handcuffed or under arrest during this interview. *See id.* at p. 28.

Sometime later, PRPD homicide agent, Arnold García was assigned to this case in the state law enforcement investigation. *See Transcript of Suppression Hearing, Day 2*, Docket No. 142 at p. 9. Upon getting acquainted with the case and the interviews that had been made, Agent García proceeded to obtain a state DNA search warrant against Torres-Rojas dated December 21, 2016. *See id.* at pp. 8-9. Agent García gave a sworn statement as part of the request for a search warrant before the Court of Aibonito. *See id.* at pp. 48-49; *see also* Dft. Exhibit No. A- A1. Later that day, several agents, including Agent Forti, served the summons for the DNA search warrant on Torres-Rojas and asked him to appear at the Aibonito police headquarters in order to execute the warrant. *See Transcript of Suppression Hearing, Day 2*, Docket No. 142 at pp. 64-65; *see also* Dft. Exhibit No. B-B1. Thereupon, the PRPD informed the FBI that they would be conducting the DNA swab upon Torres-Rojas and requested support from the FBI to take the swabs and ship them to the FBI laboratory in Quantico. *See Transcript of Suppression Hearing, Day 1*, Docket No. 140 at pp. 78-79.

On December 22, 2016, FBI agents, José Alvarado, Cristobal Rodríguez, and Carlos Cabán went to the Aibonito precinct and met with Agent García and a PRPD technical services agent for the collection of the swabs. *See id.* The Court notes that although Cristobal Rodríguez

testified under oath that he was not present during Torres' December 22, 2016, interview, Torres-Rojas, PRPD Agent García and TFO Alvarado all testified that TFO Rodríguez was present. Likewise, the FBI's receipt for the Defendant's DNA swab dates December 22, 2016, was signed as received by TFO Rodríguez. *See* Dft. Exhibit No. D[3]. Torres-Rojas arrived at the police headquarters accompanied by his father. *See id.* at 79. On said date the following events took place.[4] The Defendant's father approached the FBI agents and inquired as to what was going on as he was worried about his son. The agents moved to a more secluded area of the hallway and explained to his father that Torres-Rojas was a suspect in an investigation and that others were signaling him as the shooter. *See id.* at pp. 79-80. Upon speaking with the agents, Torres' father asked to speak to his son alone. Once the Defendant's father spoke to him, he approached the FBI agents and told them that Torres-Rojas "is willing to talk with you." *See id.* at p. 81. According to Torres-Rojas, during his conversation with his father, he was crying and told him "that if [he] knew anything about what [the Defendant] was being accused of, to tell the truth." *See Transcript of Suppression Hearing, Day 2*, Docket No. 142 at p. 110. Thereupon, Torres-Rojas acceded to speak with the agents, the agents read him his *Miranda* rights and told the truth about what happened that night. *See* Gov. Exhibit No. 4-4a.[5]

---

[3] BY MS. EARL: Q. On direct testimony, you mentioned that Agent Cabán and Agent Alvarado had interviewed Mr. Torres on December 22, 2016.
A. Yes.
Q. To be clear for the record, you were not present at the December 22nd interview?
A. No.
Q. So you have no personal knowledge about what Mr. Torres said, if anything, during that interview?
A. No.
*Transcript of Suppression Hearing, Day 1*, Docket No. 140 at pp. 46-47.
[4] The Court notes that although there is dispute as to the order in which the events took place that day, the exhibits provided by the parties demonstrate that on December 22, 2016, Torres-Rojas was mirandized first by federal agents at 12:24 p.m. and then by the PRPD before the DNA swab at 1:05 p.m. *See* Gov. Exhibit 4; Dft. Exhibit No. C-C1.
[5] Q. And you mentioned that your father told you that if you knew anything about this investigation, to tell the truth. Is that right?
A. [Torres-Rojas] He said that to me, yes. That's right.
Q. And going back a little bit, you said you have a very good relationship with your dad, correct?

During his interview, Torres-Rojas seemed to be relaxed, just concerned like his father. *See Transcript of Suppression Hearing, Day 1*, Docket No. 140 at p. 85.

During the interview, Agent Alvarado took notes as to the facts that were being narrated by Torre-Rojas. Thereupon, Agent Alvarado read and handed the notes to Torres-Rojas to make sure that they were accurate, and asked Torres-Rojas to sign them if he agreed with its contents. *See id.* at p. 88; *see also* Gov. Exhibit No. 5-5a. Torres-Rojas signed the notes. The interview lasted approximately forty (40) minutes. *See id.* at p. 94. This interview was not recorded. *See Transcript of Suppression Hearing, Day 1*, Docket No. 140 at pp. 54-55. Torres-Rojas and his father left the Aibonito headquarters after the interview and DNA swab. The Court notes that during this interview, Torres-Rojas did not appear with an attorney and did not request an attorney at any time. *See Transcript of Suppression Hearing, Day 2*, Docket No. 142 at p. 134. He was never handcuffed nor placed under arrest. *See Transcript of Suppression Hearing, Day 1*, Docket No. 140 at p. 93.

Five (5) days later, namely, on December 27, 2016, the FBI agents contacted Torres-Rojas and asked him to come to their regional offices in Ponce, Puerto Rico because they had some follow up questions regarding the account of events he provided during the December

---

A. That is correct.
Q. So I am assuming that you have a lot of respect for your father.
A. That is correct.
Q. And I am also assuming that you have a lot of love for your father.
A. That is correct.
Q. So in that moment when you saw your father asking you that if you knew anything, to say the truth, you felt forced to say something; is that right?
A. That is correct.
Q. And you told the truth?
A. I told the truth, yeah.
Q. Which is what your dad had asked you to do?
A. That is correct.
*See Transcript of Suppression Hearing, Day 2*, Docket No. 142 at p. 132 (emphasis ours).

22, 2016, interview. *See id.* at p. 96. As Torres-Rojas claimed that his car would not survive a trip to Ponce, Agents Cabán and Rodríguez offered to pick him up and drove him to the Ponce regional office. *See id.* at p. 47. Upon arrival, the Defendant was read his *Miranda* rights, the agents explained that he was not under arrest, and Torres-Rojas gave statements to Cabán, Rodríguez and Alvarado. *See id.* at pp. 20, 97. During this interview, Torres-Rojas reiterated his participation in the carjacking and murder that took place on June 12, 2016, and answered follow up questions including the amount of money that was stolen and if narcotics were used during the robbery. *See id.* at p. 97. Agent Alvarado, once again, took notes during the interview and handed them over to Torres-Rojas so that he would review them and sign them. *See id.* at p. 99; *see also* Gov. Exhibit No. 6-6a. Torres-Rojas signed the notes.[6] The interview lasted approximately fifteen (15) minutes and was not recorded. *See Transcript of Suppression Hearing, Day 1*, at pp. 55, 101. During this interview, Torres-Rojas seemed calmer and more helpful than in the previous interview. *See id.* at pp. 28, 102. He was not handcuffed nor placed under arrest. *See id.* Torres-Rojas did not request the presence of an attorney during this interview and was driven back to Orocovis by the agents once the interview concluded. *See id.* at p. 102. The Defendant was ultimately placed under arrest on March 27, 2018, namely, one (1) year and three (3) months after the final interview.

Torres-Rojas now moves to suppress the incriminatory statements provided to law enforcement officers as they "were not the product of voluntary choice, but rather a result of unconstitutional police conduct …" which had "a coercive effect." Docket No. 79 at pp. 3 and 5. Specifically, the Defendant claims that

---

[6] *Ibid.*

[a]gents subjected [his] family to tactics that led [him] to make incriminating statements. The circumstances surrounding [Torres'] third interrogation with FBI agents differ from the previous occasions, and raise questions about the propriety of the tactics employed by the agents. Though cooperative, [Torres] had always demonstrated an unwillingness to make incriminating statements, both on August 8 and 18; and he had the wherewithal to invoke counsel. The interviews on August 8 and 18 were also shorter in nature.

*Id.* at pp. 9-10. Therefore, Torres-Rojas claims that these statements are in violation of his Fifth Amendment Rights. *Id.* at p. 10.

In turn, the Government argues that "[n]ow, realizing that his confession has serious consequences, Torres has changed his tune. Without citing any evidence of police coercion or misconduct—and while acknowledging that he, initialed and signed multiple advisement of rights forms—Torres now claims that his confession was coerced, unknowing, and involuntary." Docket No. 87 at p. 4. As such, "[t]he Court should deny Torres' motion because defendant's statement, as contained in Defendant's sworn statement, are simply not accurate and therefore, they do not amount to an unknowing and involuntary confession under the law." *Id.*

## II.    MOTION TO SUPPRESS STATEMENTS

### A. *Legal Standard*

The Fifth Amendment right against self-incrimination prohibits courts from admitting into evidence a defendant's involuntary confession. Dickerson v. U.S., 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000); *see* U.S. Const. Amend. V. In assessing whether a confession is voluntary, courts must inquire "whether the will of the defendant had been overborne so that the statement was not his free and voluntary act." Bryant v. Vose, 785 F.2d 364, 367-68 (1st Cir. 1986) (quoting Procunier v. Atchley, 400 U.S. 446, 453, 91 S.Ct. 485, 27 L.Ed.2d 524 (1971).

The voluntary nature of the statements is determined by considering "the totality of circumstances, including both the nature of the police activity and the defendant's situation." United States v. Jacques, 744 F.3d 804, 809 (1st Cir. 2014) (quoting United States v. Hughes, 640 F.3d 428, 438 (1st Cir. 2011)). Relevant considerations include the length and nature of the questioning, promises or threats made by investigators, and any deprivation of the suspect's essential needs. *Id.* They also include the defendant's personal circumstances, including his age, education, intelligence, and mental condition, as well as his prior experience with the criminal justice system. United States v. Jackson, 608 F.3d 100, 103 (1st Cir. 2010); United States v. Rojas-Tapia, 446 F.3d 1, 8 (1st Cir. 2006). A defendant's calm demeanor and the lucidity of his statements weigh in favor of finding his confession voluntary. Jacques, 744 F.3d at 809.

Waiver of *Miranda* rights must also be voluntary. *See e.g.* U.S. v. Ceccolini, 435 U.S. 268, 276, 98 S.Ct. 1054 (1978). While "the fact that a defendant was given *Miranda* warnings does not dispense with the voluntariness inquiry ... [the] cases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that law enforcement authorities adhered to ... Miranda are rare." Dickerson, 530 U.S. at 444. Thus, only confessions that are "procured by coercive official tactics should be excluded as involuntary." U.S. v. Bryan, 145 F.3d 405, 407 (1st Cir. 1998)(citing Colorado v. Conelly, 479 U.S. 157, 167, 107 S.Ct. 515 (1986)). Where a knowing and intelligent waiver of *Miranda* rights is found to be uncoerced, the Court's Fifth Amendment waiver analysis is complete and waiver is valid as a matter of law. Moran v. Burbine, 475 U.S. 412, 422-23, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). In order to determine that officials used coercive tactics, the facts must

"add up to 'police overreaching.'" United States v. Genao, 281 F.3d 305, 310 (1st Cir. 2002) (citing Conelly, 479 U.S. at 170).

Lastly, in *Jacques*, the First Circuit recognized that "psychological duress may suffice to overbear a defendant's will so as to make subsequent statements inadmissible." Jacques, 744 F.3d at 811. In sum, "an inquiring court must conduct the juridical equivalent of an archeological dig into the whole of the circumstances." United States v. Hughes, 640 F.3d 428, 438 (1st Cir. 2011).

### B. *Legal Analysis*

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself." U.S.Const. Amend V. Thus, *Miranda* warns that law enforcement officers must employ certain procedural safeguards to ensure that a suspect's Fifth Amendment privilege is not infringed upon. Dickerson, 530 U.S. at 444; Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602 (1966). To comply with *Miranda*, a law enforcement officer "must give a suspect proper *Miranda* warnings before he [or she] is subjected to custodial interrogation." Jackson, 544 F.3d at 356 (1st Cir. 2008)(citing Miranda, 384 U.S. at 479). Statements which are obtained in the absence of *Miranda* warnings must be suppressed. *Id.* Nonetheless, [t]he *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions." Berghuis v. Thompkins, 560 U.S. 370, 387, 130 S. Ct. 2250, 2263, 176 L. Ed. 2d 1098 (2010).

By the same token, the Supreme Court has explained that an invocation for counsel pursuant to *Miranda* must be made "unambiguously." *See* Davis v. United States, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). Specifically, when a defendant makes a

"simple, unambiguous statement" that "he want[s] to remain silent or that he [does] not want to talk with the police . . . [] invoke[s] his 'right to cut off questioning.'" <u>Berghuis</u>, 560 U.S. at 382. Therefore, "[i]f an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." <u>Berghuis</u>, 560 U.S. at 381 (internal quotations omitted).

Yet, the prosecution bears the burden of proof and must show that *Miranda* waiver was not only knowing and intelligent, but also voluntary, by the preponderance of the evidence. <u>Conelly</u>, 479 U.S. at 169; <u>Lego v. Twomey</u>, 404 U.S. 477, 489, 92 S.Ct. 619 (1972). Importantly, "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." <u>North Carolina v. Butler</u>, 441 U.S. 369, 373, 99 S. Ct. 1755, 1757, 60 L. Ed. 2d 286 (1979). But ultimately, "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent. <u>Berghuis</u>, 560 U.S. at 384. Lastly, "[i]f [the Government] establishes that a *Miranda* warning was given, and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate 'a valid waiver' of Miranda rights. The prosecution must make the additional showing that the accused understood these rights." *Id.*

As previously explained, generally, the voluntary nature of the statements is determined by considering "the totality of circumstances, including both the nature of the police activity

and the defendant's situation." <u>Jacques</u>, 744 F.3d at 809 (quoting <u>Hughes</u>, 640 F.3d at 438). The length and nature of the questioning, potential threats made by the law enforcement officers and deprivation of the suspect's needs are some of the considerations that must be evaluated by the Court. *See id.* Additionally, the Court must consider the defendant's personal circumstances such as, his age, education, intelligence, and mental condition, as well as his criminal record. *See* <u>Jackson</u>, 608 F.3d at 103. Lastly, the demeanor of the defendant also comes into play when determining whether a confession was voluntary. *See* <u>Jacques</u>, 744 F.3d at 809.

Here, an evaluation of the totality of circumstances surrounding the Defendant's statements inclines against suppression. The Court explains. Torres-Rojas was interviewed in four (4) separate occasions. Namely, on August 8th, August 18th, December 22nd, and December 27th, 2016. In all four (4) instances he was read and given his *Miranda* warnings, which he signed. *See* Gov. Exhibit Nos. 1-1a, 2-2a, 3-3a and 4-4a. There is no dispute as to Torres' signature in the *Miranda* forms. There is also no dispute that even if Torres-Rojas does not know how to read, he understands the Spanish language. The fact that the agents read the *Miranda* rights to the Defendant in Spanish, and he signed the Spanish language forms in all four (4) interviews weighs in favor of a knowing and voluntary waiver. Furthermore, no evidence has been presented that Torres-Rojas was threatened or coerced by the agents in any of the four (4) interviews. Torres-Rojas was not handcuffed nor placed under arrest in any of these four (4) instances, and he was free to go once the interviews concluded. Lastly, it is undisputed that Torres-Rojas said he would need to consult with an attorney prior to agreeing to a polygraph test and check with an attorney prior undergoing a DNA Test. This statements

are clearly ambiguous, thus, the agents were not required to end the interrogation. Berghuis, 560 U.S. at 381.

Going through the interviews one by one, the August 8th interview lasted approximately 15 minutes. It is undisputed that the agents did not tell Torres-Rojas that he was obligated to appear at the Orocovis precinct on that date or else he would be arrested. *See Transcript of Suppression Hearing, Day 2*, Docket No. 142 at p. 123. There is also no dispute that Torres-Rojas was asked as to his willingness to take a polygraph test. As he said he needed to "consult with an attorney to then do that procedure," the agents finished the interview. *See id.* at pp. 100-101.

Torres-Rojas was interviewed again on August 18th, 2016. There is no dispute that Torres-Rojas received a call from Forti a few days after the August 8th, interview. Initially, the Defendant did not answer the call, but he eventually called Forti back while some guests were over his house. *See id.* at p. 124. It is further undisputed that Forti did not threaten Torres-Rojas with an arrest if he did not agree to be interviewed. *See id.* at p. 125. Torres-Rojas agreed to return to the Orocovis precinct "to clarify a misunderstanding" with Agent Forti. *Id.* at p. 103. According to Torres-Rojas, "Agent Forti got in touch with Agent Cabán, the federal agents, saying that [he] was going to talk to them" when that was not the case. *Id.* at p. 102. The second interview lasted approximately 12 or 15 minutes, and upon concluding he was free to go. *See id.* There is no dispute that he was not handcuffed or placed under arrest at any time. *See id.* at p. 126. It is also undisputed that Torres-Rojas did not appear with an attorney as he "was getting there to clarify a misconception that Forti had noticed, but not to be in an interview." *Id.* at pp. 126-27. And once the Defendant clarified the misunderstanding the interview concluded, and he left the Orocovis precinct. *See id.*

Moving on to the December 22nd, 2016, interview. On December 21st, 2016, a search warrant was issued by the Court in Aibonito. Torres-Rojas was served a citation to appear at the Aibonito precinct for a DNA sample. *See id.* at p. 128. There is no dispute that a DNA test was performed on the Defendant. And that the agents at some point spoke with Torres-Rojas' father for approximately ten (10) minutes. *See id.* at p. 131. As a result thereof, Torres-Rojas and his father spoke alone. And Torres-Rojas' father was crying. *See id.* at pp. 131-32. It is also undisputed that Torres-Rojas' father told him that if he knew anything about the investigation to tell the truth. *See id.* at p. 132. And thereupon, he told the truth to the agents as to his involvement in this case. *See id.* It is also undisputed that Torres-Rojas did not arrive at the Aibonito precinct with an attorney as "there was no time." *See id.* at pp. 134-35. But Torres-Rojas did not request an attorney once he saw his father crying and asking him to tell the truth. *See id.* at p. 135. The interview lasted approximately 40 minutes. He was not handcuffed or placed under arrest during this interview. Once the interview ended, he was free to go with his father.

On December 27th, 2016, the last interview took place. Just like before, Torres-Rojas was not handcuffed nor placed under arrest at any time. The interview lasted approximately fifteen (15) minutes. And Torres-Rojas answered follow up questions as to his participation in the incident. He was never handcuffed or placed under arrest. Torres-Rojas was ultimately arrested in 2018. *See id.* at p. 114.

There are factors that weigh in favor of suppression. However, the Court finds that they pale in comparison with the Government's showing by preponderance of the evidence that the Defendant voluntarily agreed to speak with the agents after being properly informed his *Miranda* rights. For instance, Torres-Rojas argues that "this court does not have the advantage

16

of viewing [his] demeanor or the agents' tactics because the FBI agents here, acting contrary to their own policies, did not video or audio record either [his] statements on December 22 or December 27, 2016." Docket No. 149 at p. 11. Yet, "in federal court … there is no federal constitutional right to have one's custodial interrogation recorded." United States v. Meadows, 571 F.3d 131, 147 (1st Cir. 2009) "The federal courts uniformly have rejected the argument that the Constitution mandates, as a matter of due process, that a defendant's confession be electronically recorded." *Id.* (quoting Roberto Iraola, *The Electronic Recording of Criminal Interrogations,* 40 U. Rich. L.Rev. 463, 471 (2006)). As a matter of fact, the Defendant relies on the testimony of Agent Alvarado in support of the recording policy requirement. Yet, Agent Alvarado describes the FBI's recording of interviews as policy "when feasible." Docket No. 149 at p. 11; *see also Transcript of Suppression Hearing, Day 2*, Docket No. 142 at pp. 5-6.

The Defendant recognizes that "the court does not have to grant suppression simply because the agents chose not to record the interview, [but] it can take into consideration the agents' reasons for not recording the only allegedly incriminating statements given by Mr. Torres, and whether it thinks those reasons are believable." Docket No. 149 at p. 15. But the argument falls short as the reasons provided by the agents for not recording the last two (2) interviews are not necessarily unreasonable. For instance, Agent Alvarado explained that the December 22, 2016, interview was not recorded as they were not expecting to conduct an interview during their visit to Aibonito but rather to collect Torres' DNA swab and work on other matters. *See Transcript of Suppression Hearing, Day 2,* at pp. 10-11. Whether the interview took place before the DNA swab or vice versa is not necessarily a determinant factor here, as recollections may vary when approximately six (6) years have passed since these

interviews took place. Even the Defendant's sworn statement includes inconsistencies with the testimony he provided in Court. *See generally* Docket No. 79-1, ¶¶ 2, 4, 8, 10.

Next, the Defendant claims that his personal circumstances, i.e., his inability to read, and the fact that he is a special education student is to be considered "in evaluating the voluntariness of a confession." Docket No. 149 at p. 17. However, even with his history in special education, it is undisputed that even if the Defendant does not know how to read, he understands the Spanish language. The fact that the agents read the *Miranda* rights to the Defendant in Spanish, and he signed the Spanish language forms in all four (4) interviews weighs in favor of a knowing and voluntary waiver.

In favor of suppression, Torres-Rojas also argues that he demonstrated truthfulness in a separate judicial proceeding. In 2013, the Defendant was a material witness in a state court case related to his brother's murder. *See Transcript of Suppression, Day 1*, Docket No. 140 at pp. 59-60. Agent Forti testified that "thanks to [Torres'] help and integrity, the person [responsible for the murder] was found guilty in a state trial." *Id.* As such, Forti was surprised when he heard that Torres-Rojas was potentially related to the carjacking and murder subject of this case. *Id.* at p. 62. Yet, as previously mentioned, there are inconsistencies between the *Sworn Statement* that was filed in support of suppression and the testimony that he gave in Court.

And lastly, the Defendant recurs to alleged contradictory statements from the agents that were called as witnesses. The Court finds questionable the fact that TFO Rodríguez claimed not to be present in the December 22nd, 2016, interview, yet Agent Alvarado and PRPD Agent García both testified that he was in fact present. Even more, the receipt of the DNA swab form dated December 22nd, 2016, contains TFO Rodríguez's signature. *See* Dft.

Exhibit D. As to Agent Forti, the Defendant describes as unbelievable the fact that he only told Agent Cabán about incriminating statements Torres-Rojas made during their telephone conversation. Moreover, that Forti made no recording, took no notes, and did not make a report of said call. *See* Docket No. 149 at p. 21.

But ultimately, the voluntariness is determined not upon one factor but the totality of the circumstances surrounding the statements. In sum, "[t]he voluntariness of a waiver of th[e] [Fifth Amendment] privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." Connelly, 479 U.S. at 170; *see* Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d. 410 (1986). The arguments raised by the Defendant fall short in demonstrating that he was coerced into confessing. There is no evidence that Torres-Rojas was threatened, intimidated, or pressured into providing statements to the agents. As such, no police overreaching occurred. Therefore, based on the totality of the circumstances, the Court finds that the Defendant knowingly and voluntarily waived his First Amendment right to remain silent or of the right to counsel when making incriminating statements. As such, the Defendant's *Motion to Suppress Statements* (Docket No. 79) is hereby **DENIED.**

### III.   SUPPLEMENTAL SUPPRESSION MOTION PURSUANT TO FRANKS V. DELAWARE

As previously mentioned, Torres-Rojas filed a *Supplemental Suppression Motion* pursuant to Franks v. Delaware, 438 U.S. 154, 171 (1978). *See* Docket No. 150. A *Response in Opposition* was filed by the United States. *See* Docket No. 158. This time, the Defendant claims that "Agent Arnold Garcia provided false information in the affidavit for a search warrant for the DNA of Mr. Torres . . . knowingly or with reckless disregard for the truth, and

without its inclusion, the Aibonito Court that granted the warrant would have instead made a negative finding as to probable cause." Docket No. 150 at p. 1. In turn, the United States argues that the Court should deny the motion as the search is presumed to be valid per First Circuit precedent. According to the Government,

> Defendant has failed to rebut the presumption: He has failed to make the requisite 'substantial preliminary showing' that the Puerto Rico Police Department ("PRPD") agent who prepared the affidavit in support of the state search warrant made any false statement (let alone intentionally or recklessly, as required by established jurisprudence) that was material to the probable cause finding that resulted in the issuance of the warrant.

Docket No. 158 at pp. 1-2.

### A. *Legal Standard*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. Therefore, law enforcement must generally secure a warrant prior to conducting a search or seizure. *See* U.S. v. Rigaud, 684 F.3d 169, 173 (1st Cir.2012). "Probable cause exists when the totality of the circumstances suggest that 'there is a fair probability that contraband or evidence of a crime will be found in a particular place." ' *Id.* (quoting U.S. v. Hicks, 575 F.3d 130, 136 (1st Cir.2009) (internal quotation marks omitted)).

The issuance of a search warrant can be supported by an affidavit. *See Id.* A presumption of validity attaches to the supporting affidavit, but a defendant can challenge the substance of the affidavit by requesting a *Franks* hearing. *See Id.*; Franks v. Delaware, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978). A *Franks* hearing is only

appropriate when a defendant shows that the affidavit contained "allegations of deliberate falsehood or of reckless disregard for the truth," which "must be accompanied by an offer of proof." Franks, 438 U.S. at 171. Nevertheless, even if a defendant makes a showing of deliberate falsehood or reckless disregard for the truth, a court must deny a request for a hearing if "there remains sufficient content in the warrant to support a finding of probable cause." *Id.* at 171–172.

### B. Legal Analysis

The Sworn Statement submitted by PRPD Agent Arnold García in support of the issuance of a search warrant against Torres, subject to this suppression request under *Franks* provides in its pertinent part that,

> On the date of June 12, 2015, [García] was assigned complaint number 2015-13- 055-02255 for the crime of Murder in which Mr. José Medina Meléndez was killed, events which occurred at Highway 566, kilometer 3.2, Bo. Saltos Cabra, Business El Rejón del Gallo in Orocovis, where also the motor vehicle Make Toyota, Model Sequoia, color gray, license plate EDL-582, year 2001, belonging to the deceased, was stolen. The Puerto Rico Police Department, along with the Evidence Response Unit of the F.B.I. Task Force recovered said vehicle on June 15, 2015, at 7:30 p.m., at Highway 157, kilometer 17.0 interior, Barrio Damián Arriba, Sector Culebra in Orocovis, which is a solitary, wooded area, removed from the main community. In said vehicle, evidence was collected with genetic material and fingerprints related to these events. Through interviews performed and tips, Mr. Jonathan Torres Rojas has come up as one of the suspects. It emerges from said interview that this young man was seen together with Brandon Vélez López and Juan Negrón Rodríguez a.k.a. Ratón [tr. note, in English, "Mouse"], who were driving said motor vehicle toward the area of the Culebra Sector of the Damián Arriba neighborhood in Orocovis. It also emerges that two days after the events of the murder, the young man Brandon Vélez López was seen together with Juan Negrón Rodríguez a.k.a. Ratón [tr. note, in English, "Mouse"] and Jonathan Torres Rojas, leaving the place where the aforementioned vehicle was recovered. Moreover, it arises from interviews and tips that on Sunday, June 14, 2015, around noon, some boys living in the area, while preparing to go to the river, noticed three individuals getting out of the aforementioned motor vehicle, describing these individuals, one of them as a white individual, short in stature, and the other person as daker-skinned and also short in stature. These same individuals were seen that same

day of June 14, 2015, at around 10:30 p.m. [sic] from the place where the
aforesaid vehicle was recovered. This case is in the investigation phase, in order
to be able to complete it, it is necessary to obtain the genetic profile and
fingerprints of Jonathan Torres Rojas.

Docket No. 150, Exhibit No. 5-5a.

Originally, Juan Negrón-Rodríguez a.k.a. "Ratón" and Brandon Vélez-López were the

primary suspects of the carjacking and murder offense. As part of the investigation led by the

PRPD and the FBI, interviewed several persons who had allegedly seen two (2) individuals,

who matched the description of Negrón and Vélez leave the area of the river on June 14, 2015.

*See* Docket No. 150, Exhibit Nos. 1, 2 and 3; *see also* Docket No. 155, Exhibit No. 1.

Specifically, Daisy Rivera Martínez said that on June 14, 2015, "she saw from her house that

two young men whom she knows as Ratón and Brandon were in a charcoal gray Mazda vehicle

driving down towards the same area where [her] daughter's cousin saw the SUV. She said that

it was rumored around the neighborhood that Brandon and Ratón were who committed the

businessman's crime." Docket No. 155, Exhibit No. 1 at p. 4.

With the information obtained during the investigation, Agent García presented an

affidavit before Aibonito Court judge, Manuel Méndez, essentially, detailing the information

gathered from the investigation, why there was probable cause to believe that Ratón and Vélez

were involved in the robbery and requesting warrants for their DNA. *See* Docket No. 150,

Exhibit No. 4; *see also* Docket No. 155, Exhibit No. 2[7].

The affidavit pertaining to Vélez is similar to the one prepared as to the Defendant. To

mention a few, the fact that Vélez "has come up as one of the suspects;" "that [Vélez] was seen

---

[7] The Court notes that the Defendant solely produced the affidavit pertaining to the request for a search warrant as to
Brandon Vélez. For the sole purpose of this analysis, the Court will assume that the affidavit pertaining to Ratón
contains similar information.

driving towards the Culebra Sector in the Damian Arriba Ward in said vehicle;" that "that two days after the murder events, the young man Brandon Vélez López, was seen with Juan Negrón Rodríguez aka Ratón, leaving the location where the abovementioned vehicle was recovered;" the description given by some boys from the neighborhood of "two individuals getting out of the vehicle described above, describing these individuals, one of them as white, short in stature and the other one as darker and also short in stature;" that the same two individuals were seen on that same day of June 14, 2015, at approximately 10:30 p.m. in the location where the abovementioned vehicle was recovered;" and the necessity to obtain Vélez's "genetic profile and fingerprints in order to complete it." *Id.*

Sometime thereafter, Ratón was charged with an unrelated state offense. While imprisoned, the FBI paid him a visit. It was during this interview that Ratón identified Torres-Rojas as a participant of the robbery and identified the Defendant through mugshots available in the police database. *See Transcript of Suppression Hearing, Day 2*, Docket No. 140 at pp. 33-34. Thereupon, the FBI and PRPD agents moved on with the investigation, and interviewed Torres-Rojas in the four (4) occasions previously described.

On December 21st, 2016, Agent García moved for a search warrant before an Aibonito Court judge. *See* Dft. Exhibit No. A-A1. The affidavit contained similarities with the one used for obtaining Vélez's DNA sample. *See Sworn Statement* at pp. 19-20. However, in order for the Court to determine whether a *Franks* hearing is appropriate, the Defendant has to demonstrate that the affidavit contained allegations of deliberate falsehood or of reckless disregard for the truth accompanied by an offer of proof. But even if the Defendant makes this showing, the request must be denied if there remains sufficient content in the warrant to

support a finding of probable cause. This is where Torres' *Franks* request inevitably fails. The Court explains.

In the case at bar, Defendant alleges that "the affidavit included false statements made by Agent García, either knowingly or with reckless disregard for the truth" (Docket No. 150 at p. 9). Yet, upon reviewing the similarities between Vélez and Torres' affidavits, the arguments raised by the Defendant do not amount to "deliberate falsehood or of reckless disregard for the truth." Specifically, the Court identified the following deficiency in Torres-Rojas' affidavit: that some boys living in the area noticed three individuals getting out of the vehicle near the river, but described only two (2) individuals.

But even if the first prong of *Franks* is met, Torres-Rojas fails to establish that when eliminating the alleged false statement, the information contained in the affidavit is insufficient for a finding of probable cause. When eliminating the potentially false statement as to the boys who saw "three individuals" but described two, the affidavit still establishes that a murder occurred in the Municipality of Orocovis; that the FBI Task Force recovered the vehicle three (3) days later and genetic material was collected from said vehicle; that through interviews and tips, Torres-Rojas has come up as one of the suspects; that Torres-Rojas was seen with Vélez and Ratón driving the motor vehicle towards a neighborhood in Orocovis; that Torres-Rojas was seen leaving the place where the vehicle was recovered with Ratón and Negrón; that the boys saw two individuals getting out of the vehicle on June 14, 2015, with a description consistent with Vélez and Ratón; and that Torres' genetic profile and fingerprints are necessary in furtherance of the investigation.

The First Circuit has explained that "[p]robable cause exists when the affidavit upon which a warrant is founded demonstrates in some trustworthy fashion the likelihood that an

offense has been committed...." <u>United States v. Vigeant</u>, 176 F.3d 565, 569 (1st Cir. 1999) (quoting <u>United States v. Schaefer</u>, 87 F.3d 562-65 (1st Cir. 1996). This information is sufficient to justify a probable cause finding. "In determining the sufficiency of an affidavit, we consider whether the 'totality of the circumstances' stated in the affidavit demonstrates probable cause to search the premises." <u>United States v. Barnard</u>, 299 F.3d 90, 93 (1st Cir. 2002)

During the *Suppression Hearing*, Agent Alvarado testified that Ratón signaled Torres-Rojas as a suspect, namely, the shooter, when he was interviewed while imprisoned for an unrelated state case. *See Transcript of Suppression Hearing, Day 2*, Docket No. 142 at pp. 9, 22. Such information is valuable and had a determinant effect in the investigation, as thereafter, law enforcement officers sought to interview the Defendant related to this case.

Likewise, the premise that "on Sunday, June 14, 2015, around noon, some boys living in the area, while preparing to go to the river, noticed three individuals getting out of the aforementioned motor vehicle, describing these individuals, one of them as a white individual, short in stature, and the other person as daker-skinned and also short in stature" seems to be more a typographical error than an intentional falsehood, as only (2) individuals are described in the following sentence. If there was an intention to provide false information, a description of a third individual would have been included. This did not happen.

Lastly, although the Defendant relies on the interviews of Coralis Cintron, Lydia Torres, and Daisy Rivera-Martinez, they were not identified as the sources in the affidavit and most critical, they were not the only persons interviewed in relation to this case. Agent García testified under oath that Torres-Rojas became a suspect "[t]hrough the interviews that were carried out as part of the investigation, <u>through the confidential information</u> that we received,

through the <u>testimony of the humble people of the area</u> of Orocovis who provided -- or approached us with information, <u>but without getting involved in the case</u>." *See id.* at pp. 45-46 (emphasis ours). Therefore, the totality of the information obtained during the investigation led to Agent García's decision to seek a search warrant for Torres' DNA test.

Based on the aforementioned, the Court finds by a totality of the circumstances that Torres's arguments do not amount to making a "substantial preliminary showing" that the false statements were made and that said statements were knowingly and intentionally or with reckless disregard for the truth. By the same token, Defendant fails to establish that the typographical error between two (2) and three (3) individuals was intentionally made as without it, no probable cause would have been found by the Aibonito Court. Accordingly, Defendant's motion to suppress pursuant to *Franks* is hereby **DENIED** in this regard without a hearing.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 10th day of March, 2023.

*S/Daniel R. Domínguez*
Daniel R. Domínguez
United States District Judge